[Civ. No. 3535. First Appellate District, Division One.—February 2, 1921.]

## THOMAS B. SULLIVAN et al., Appellants, v. EMMA GERTRUDE SULLIVAN et al., Respondents.

[1] TRUST—CONVEYANCE BY FATHER TO DAUGHTER—CONVEYANCES BY DAUGHTER TO OTHER CHILDREN UPON FATHER'S DEATH—FINDING AGAINST ORAL PROMISE—SUFFICIENCY OF EVIDENCE.—In this action by certain children of a deceased person against one of the daughters of the deceased and the other children who refused to join as plaintiffs, to establish a trust, the finding against the oral promise alleged to have been made by the daughter to make conveyances of the property conveyed to her by her father to all of the children immediately upon his death finds substantial support in the record.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. George E. Crothers, Judge. Affirmed.

The facts are stated in the opinion of the court.

Sullivan, Sullivan & Theo. J. Roche for Appellants.

Keyes & Erskine for Respondents.

SEAWELL, P. J., *pro tem.*—All of the parties to this action are children of John J. Sullivan, Sr., deceased, except James A. MacMonnies, who is the husband of defendant, Grace E. MacMonnies, and for that reason is made a party. Defendants John J. Sullivan and Grace MacMonnies were made parties because of their refusal to join plaintiffs in the action. James Sullivan, whose name frequently appears in the proceedings, was also a child of said John J. Sullivan, deceased, but died unmarried, without issue and intestate. The parties to the action, including James, deceased, comprised the entire family of children of said John J. Sullivan and Elizabeth M. Sullivan, his wife. The latter died on the tenth day of April, 1904, and her husband remained a widower thereafter.

The record title of the property in suit was conveyed to Emma Gertrude Sullivan by her father, John J. Sullivan,

by deeds of conveyance, as will hereafter appear. The deed upon which plaintiffs rely to establish a trust relation, with Emma as trustee for the other children, is dated June 20, 1904. It conveys, upon its face, the title to her absolute.

The purpose of plaintiffs by this action, first, was to establish a trusteeship in Emma, and, next, to compel her to convey to each of said brothers and sisters, six in number, their respective equitable interests in said property. The trust sought to be established rests in parol and consists in an alleged oral promise made by Emma to her father at the time he executed and placed in escrow said deed dated June 20, 1904, that she would hold it as a trustee for the benefit of all of his children and upon his death convey to each child then living an equal interest in and to said property. The appointment of a receiver, an accounting for rents, issues, and profits, and the usual relief incidental to a trusteeship is demanded.

The facts practically conceded or incontestably established are these: The property in litigation constituted the family residence of the elder Sullivan for many years and is generally described as a portion of vara lot No. 122, situated on Sacramento Street, near Hyde, in the city and county of San Francisco. It has a frontage of 34 feet on Sacramento Street and a depth of 137 feet. Mrs. Elizabeth M. Sullivan filed a homestead on said real property in 1887. By proceedings taken in April, 1904, after her death, the homestead was declared vested in the husband, John J. Sullivan. The father's petition to vest the homestead in himself did not receive the approval of John, James, and Harry and perhaps one daughter, who was suspected of being in sympathy with the opposition offered by said three sons. Their antagonism, in fact open hostility, to this proceeding was bitterly resented by the father. The father, however, maintained the old homestead as a family residence to the time of his death, to wit, March 18, 1915. Prior to his death four of the children had married and established homes of their own, while others, especially the three younger male members of the family above named, being given to excesses and dissipations, came and went as their vagarious tendencies inclined them or as necessity impelled them. Emma, however, remained constantly the companion of her father to the end.

On June 20, 1904, John J. Sullivan was the admitted owner of said property in fee simple. On that day he executed a deed of gift absolute in form conveying said property to his daughter, Emma, and delivered the deed to Judge A. E. St. Sure, then a practicing attorney and the drawer thereof. John J. Sullivan and the attorney, Honorable A. F. St. Sure, were brought together by the former's son, Thomas B. Sullivan. The considerations recited in the deed are the love and affection that the father bore for his said daughter and "also for the better maintenance, support, protection, and livelihood" of said daughter. With the deed there was also delivered a letter of instructions directing said attorney to deliver said deed to his daughter Emma upon his death. By the letter of instructions he declared that delivery was made "without any reservation of right to recall the same" before death, "and with the absolute and final determination that it shall take effect when the contingency of my death happens." Contemporaneous with these instruments he executed and delivered to said attorney his holographic will by which he gave all the property of which he might die seised or possessed to his said daughter. He mentioned all of his children living by name and stated that he purposely omitted to make any provision for them. By said will full power was given to his daughter Emma, who was made executrix without bonds, to dispose of all or any part of his estate without order of court.

The former family residence occupied the same lot but was destroyed by the fire of April 18–19, 1906. In 1907 the property was improved by the erection of a building containing six flats. The estimated cost of the improvements was $7,000, and that amount was borrowed from the Humboldt Savings Bank. John J. Sullivan, as owner, gave as security therefor a mortgage on the property. He made the affidavit frequently required of borrowers as to ownership, in which he averred that he was the owner and "had never deeded or transferred said property or any part thereof since affiant acquired it." The officers of the bank, before accepting the property as security, required further of him that he obtain a deed from his children conveying to him any and all right, title, or interest they might have in said property. Accordingly, on May 2, 1907, such a deed was exe-

cuted, in which all the plaintiffs, except William B. Sullivan, then a minor, and all named defendants except John J. Sullivan, Jr., who did not appear at the trial of the cause and whose presence was and has been unknown the greater portion of time for some years past, joined. James, the other child not joining, is dead.

On October 7, 1907, finding that he had underestimated the cost of said improvements, he obtained an additional loan of $3,000 from said Humboldt Savings Bank. A deed of trust was executed securing said bank for the whole amount of the loan, to wit, $10,000. Again an affidavit was made by him, as owner, similar in all respects to the affidavit made upon obtaining said first loan of $7,000. The building was completed October 24, 1907, and on that day, in a sworn notice of completion, John J. Sullivan again described himself as owner.

On December 31, 1910, acting upon the advice of his attorney, Thomas B. Sullivan, his son and one of the plaintiffs herein, John J. Sullivan commenced an action under the provisions of the McEnerney Act (Stats. 1906, Ex. Sess. p. 78), subscribed to and filed the required affidavit in which he averred that he was the owner in fee absolute of said property, and that no conveyance of said property or any part thereof nor any interest therein had been made by him except the deed of trust executed and delivered to the Humboldt Savings Bank to secure said loan of $10,000. The affidavit concludes in the following language: "That there are no subsisting mortgages, deeds of trust or other liens against said property except as hereinbefore described. That affiant does not know and has never been informed of any other person who claims or may claim any interest in or lien upon the said property or any part thereof adversely to plaintiff except as hereinbefore described."

The only deeds of trust, mortgage claims, lien, or encumbrance of any description mentioned in said affidavit is the Humboldt Savings Bank's deed of trust. On January 6, 1913, judgment was entered establishing and quieting plaintiff's title to said property in fee simple absolute except as to the deed of trust held by said bank. The court found that all parties to this action had notice of said proceeding before the entry of judgment.

The improvements thereon were insured in the name of John J. Sullivan as owner; the deed of trust and note securing the bank for said loan were renewed and an affidavit was again made in which he declared himself the sole owner, etc. He dealt with the property in every respect and at all times as an owner deals with his own. No act showing or tending to show a want of authority over or loss of ownership of said property appears.

On July 11, 1912, said John J. Sullivan executed and delivered his last will and testament, holographic, to his said daughter. In substance and effect it is identical with the will dated June 20, 1904. This will was subsequently admitted to probate.

On May 19, 1913, John J. Sullivan executed and delivered to his daughter, Emma, a deed by which he conveyed to her the property in dispute, reserving to himself a life estate. This deed was recorded March 13, 1915. On the same day, and as a consideration therefor, Emma bound herself in writing, upon her father's death and thenceforth so long as she should live, to pay to her brother William B. Sullivan for his support not less than twenty dollars nor more than fifty dollars per month, as may be determined by said Emma Gertrude Sullivan. It was further provided that if the said William should bring any action against said sister, then the obligation to pay any sums to said William should immediately cease.

The foregoing recital includes practically all of the material record evidence touching the history of the realty and its disposition or attempted disposal. The amended complaint contains four causes of action. The first count charges the existence of confidential relations between father and daughter; alleges an oral promise made by the daughter to the father on and prior to the execution of the deed of date June 20, 1904, that she would convey to the other children living at the time of his death an equal interest in said property; asserts that said John J. Sullivan upon the alleged delivery of said deed in escrow parted with all dominion over the same and that the only interest he thereafter held in said property was "the use thereof until his death." The monthly rental value of the property was admitted to be $150. All facts necessary to establish a trust in conformity with plaintiff's theory are pleaded.

The second cause of action alleges that no money or other thing of value was given by John J. Sullivan to his children as a consideration for them to convey to him by said deed dated May 1, 1907, said property, but that said deed was executed because of the demand of said bank made upon their father that they must do so if the loan was to be obtained and that they executed said instrument for the sole purpose of enabling said John J. Sullivan to obtain said loan of $10,000. It is further alleged that said grantor and grantee fully understood that the trust with which said property had been theretofore impressed would not be affected thereby.

The third cause of action is addressed to the proceedings commenced December 31, 1907, under the provisions of "An Act to Provide for the Establishment and Quieting of Title to Real Property in Case of Loss or Destruction of Public Records," approved June 16, 1906 (Stats. 1906, Ex. Sess., p. 78), by *John J. Sullivan* v. *All Persons, etc.* It is admitted by affirmative allegations that by said proceedings John J. Sullivan was decreed to be the owner in fee simple of said real property and his title thereto established. It is further admitted that the affidavit, as prescribed by section 5 of said act, was made as described in the statement of facts therein. It is alleged that the omission of said father to name his children as having an interest in said real property adversely to himself was not designedly fraudulent, or with a purpose of repudiating the trust arising from the execution and delivery of said deed dated June 20, 1904, but, on the contrary, "such omission was innocently made, and was made with the knowledge and belief on his part, that the equitable interest of his children in said real property would not and could not be affected by the judgment in said action so made in furtherance of said trust." That he was advised by his son, Thomas B. Sullivan, attorney at law, who acted for him in said action that the judgment in said action would not affect or prejudice the rights of said children in the trust arising from the execution and delivery of said deed of June 20, 1904, but would in fact establish their legal title to said real property.

By the fourth cause of action or count it is claimed that the deed dated March 19, 1913, was the product of undue

influence exercised by Emma upon her father. The trial court having found the issue of undue influence adversely to plaintiffs, under the admission that a conflict of evidence existed as to said issue, it is not further pressed. Under plaintiffs' present theory it is regarded as an immaterial issue.

Defendant Emma Gertrude Sullivan by her answer denied on information and belief that at any time before March 19, 1915, John J. Sullivan made or executed or delivered a deed of the real property described in the action to anyone; admitted that on June 20, 1904, the document in the form of a deed of gift was handed to said A. F. St. Sure with the written instructions heretofore referred to; alleged, however, that it was the intention of John J. Sullivan that said deed should take effect at the time of his death and not before. Defendant denied that any other instructions, oral or otherwise, than those contained in said writings were given to said A. F. St. Sure. On information and belief it is denied that John J. Sullivan by the delivery of said document parted with dominion over the same or place it beyond his recall.

The theory and claim of defendant is that the deed and letter of instructions of June 20, 1904, were intended to make a testamentary disposition of said property. In other words, there was no intention in the mind of said John J. Sullivan to immediately part with title, but that said deed should become effective at the time of his death. This theory is fortified with such denials, admissions, and affirmative matters as are essential to sustain it. That an oral promise or any promise or agreement or understanding was made to or had with anyone at any time to the effect that Emma should hold said real property in trust for the benefit of the children of John J. Sullivan is specifically denied. Said deed of June 20, 1904, is alleged by the answer to have been executed because of the love and affection which the said John J. Sullivan bore for defendant Emma, and for the purpose of vesting in her at the time of the father's death absolute title to said real property, free and clear of any trust whatsoever.

Denial is made that the deed of May 1, 1907, was executed and delivered by said children to their father for any purpose other than to confirm the title of said John J. Sullivan

to said property in fee simple, and that it was intended in particular to convey to him any interest which the grantors therein might have had as heirs of their mother, Elizabeth M. Sullivan.

As special defenses to the second count or cause of action the bar of subdivision 4, section 338, and section 243, of the Code of Civil Procedure are pleaded.

In answering the third cause of action it is admitted that in bringing said action to establish and quiet his title the omission by said John J. Sullivan to name his children as having an interest adverse to himself was innocently made and without the purpose of repudiating any trust, but it is denied that such an omission was made with the knowledge or belief that the equitable interest of his children could not be affected by the judgment in said action or was made in furtherance of any trust whatever. The belief of said John J. Sullivan is alleged to have been that said judgment would establish his title to said property against all the world, including his children. That said John J. Sullivan was advised by Thomas B. Sullivan to the contrary, or at all, is denied on information and belief. It is alleged that none of his children have ever acquired any right, title, or interest in or to said real property, except defendant Emma, who became the owner by virtue of said deed from her father, executed and delivered to her March 19, 1913. Subdivision 3, section 338, of the Code of Civil Procedure is also pleaded in bar to said third cause of action.

It rested upon plaintiffs to establish primarily two essentials, to wit, first, the execution and delivery of the deed dated June 20, 1904, as a valid escrow; second, that an oral promise or agreement was made on the part of the grantee, Emma, at the time of its execution and delivery that she would convey to each of the children living upon the death of the grantor an equal share or interest in said property. In short, that she held it as a trustee for the purposes alleged in the complaint. If they have failed to establish both or either of said requirements, then their cause must fall.

It is the claim of plaintiffs that the escrow instructions which accomplished the delivery of the deed to A. F. St. Sure in themselves close the door to all attack against the

validity of the deed as an escrow. The further claim is made that the weight of the evidence confirms the trust contention. Further, the findings are attacked as being inconsistent in material respects and wholly irreconcilable except on the theory that a valid delivery in escrow was made and a trust relation between father and daughter had been established.

The attack upon the findings, especially II, V, and VII, presents the most troublesome question, as an affirmance or reversal of the cause depends upon the sufficiency and consistency of said findings to withstand the assault made upon them. By this we do not mean to say that other findings may not be considered or resorted to to clarify the situation so far as they touch upon the subject matter contained in said assailed findings. Perhaps time will be gained by reproducing said findings as they appear of record:

## Finding II.

"On the twentieth day of June, 1904, J. J. Sullivan, the father of the plaintiffs, made and signed an instrument in writing, in form of a deed of gift purporting to convey to defendant, Emma Gertrude Sullivan, the real property described in plaintiffs' amended complaint. At the time that said J. J. Sullivan signed said instrument he made, signed and handed to A. F. St. Sure, an attorney at law, an instrument in writing, in the words and figures following, to wit:

" 'San Francisco, Cal., June 20th, 1904.

" 'A. F. St. Sure,

" 'Call Building,

" 'San Francisco, Cal.

" 'Dear Sir:

" 'I herewith deliver to you a deed of gift to my daughter, Emma Gertrude Sullivan, conveying to my said daughter the realty described in said deed, being a portion of 50 Vara Lot No. 1222, situate, lying and being in the City and County of San Francisco. Said deed was executed by me this 20th day of June, 1904. I hereby deliver said deed to you, to be delivered by you to my said daughter, Emma Gertrude Sullivan, upon my death. This deed is delivered to you to be delivered by you as aforesaid without any reservation of right to recall the same before my death and

with the absolute and final determination that it shall take
effect when the contingency of my death happens.

" 'Yours truly,

" 'J. J. SULLIVAN.'

"At the time said J. J. Sullivan handed to A. F. St. Sure
said instrument, a copy of which is above set forth, he
also handed to said St. Sure said instrument in form of
deed of gift signed by him and duly acknowledged by him
before a notary public in and for the city and county of
San Francisco, purporting to convey to said defendant,
Emma Gertrude Sullivan, all the real property described
in Paragraph I of plaintiffs' amended complaint. At the
time said J. J. Sullivan handed said instrument in form
of deed to St. Sure he intended said instrument to take
effect as a conveyance upon his death and not before, and
no instructions were given by said J. J. Sullivan in respect
to said instrument in form of deed or in respect to the
real property therein described other than the instructions
contained in said instrument, a copy of which is herein set
forth, and verbal instructions to have said instrument in
form of deed recorded after his, J. J. Sullivan's death.

"That at the time when the said document, in the form
of a deed, dated the twentieth day of June, 1904, was
handed to the said A. F. St. Sure the said J. J. Sullivan
did not part with all dominion or any dominion over the
same and did not give up all right, or any right, to recall
the same or to alter its provisions or to have or enjoy
any other or further interest in the premises in said docu-
ment described, but, on the contrary, intended that the
said document should not take effect until the time of the
death of the said J. J. Sullivan."

Finding V.

This finding, after reciting a relation of confidence exist-
ing between father and daughter, proceeds: "On said
twentieth day of June, 1904, said J. J. Sullivan being desir-
ous of making a disposition of the real property described
in plaintiffs' amended complaint and hereinbefore referred
to, and by reason of the great faith and confidence then
reposed by him in said defendant, Emma Gertrude Sullivan,
and believing that said Emma Gertrude Sullivan would
faithfully carry out any wishes that might be expressed to
her by him, orally proposed to said Emma Gertrude Sullivan

that he would make and execute to her a deed of the real property hereinbefore referred to, and deliver the same to said A. F. St. Sure with instructions that he hold the same until the death of said J. J. Sullivan and then deliver the same to said Emma Gertrude Sullivan upon the express oral understanding and agreement that the said Emma Gertrude Sullivan would accept said deed and hold said property and maintain the family home or make other use or disposition of the property for the benefit of herself and the other children of said J. J. Sullivan who might survive him. Said Emma Gertrude Sullivan expressly and orally agreed to this, and in reliance upon her said agreement and upon the faith and confidence which said J. J. Sullivan had and reposed in said Emma Gertrude Sullivan and because of the relations of trust and confidence existing between them, and, excepting a desire to avoid the breaking up of the home by a partition of the property in the event of the necessity of probate proceedings, for no other reason said J. J. Sullivan signed and acknowledged said instrument in form of deed and handed the same to said A. F. St. Sure with said written and verbal instructions herein mentioned. At the time said instrument in form of deed was handed to said A. F. St. Sure said Emma Gertrude Sullivan orally agreed to accept said instrument upon the death of J. J. Sullivan, as a conveyance to her of the real property therein described upon the understanding and for the purposes above set forth. Said J. J. Sullivan would not have signed said instrument in form of deed or handed the same to A. F. St. Sure unless said Emma Gertrude Sullivan had agreed to the confidence reposed in her substantially as hereinbefore set forth. That there never was any promise by the said Emma Gertrude Sullivan or understanding between her and the said J. J. Sullivan in reference to the said property or in reference to the said instrument in the form of deed, except as hereinbefore set forth.''

### Finding VII.

''Said instrument in form of deed of gift made and signed by said J. J. Sullivan and handed to said A. F. St. Sure, as aforesaid, was not in fact delivered to A. F. St. Sure and did not in fact create a trust in favor of the children of said J. J. Sullivan or any of them. The last-mentioned

instrument was not intended by said J. J. Sullivan to be a deed creating a trust for the benefit of any of his children or anyone."

Finding II is a direct and positive finding against both the validity of the escrow and the alleged oral promise, upon which plaintiffs rely to establish a trust. It unequivocally holds that the instrument in form a deed absolute was intended to take effect as a conveyance upon the grantor's death and not before and was in effect testamentary. Further, that the oral promise sought to be established was not made.

Finding V is somewhat confusing. The main thought running through it would seem to be that the father's faith in the daughter's devotion to the best interest of the family persuaded him that she would carry out any wish he might express and sacredly comply with any request he might make. As admittedly she had been the "homemaker" in the past he believed that she would continue to stand *in loco parentis.* The finding seems to be constructed on the theory that it was the father's desire that the home should be maintained under proper supervision and that his daughter Emma was a proper member of the family to intrust with this duty. The statement of fact that the father delivered the deed to A. F. St. Sure upon the understanding and agreement that the daughter would "hold said property and maintain the family home or make *other use* or *disposition* of the property for the *benefit of herself and the other children*" is far from a direction or request that one or all of said children might compel her to make a conveyance to them or compel a sale or partition of the property. If it be conceded that a trust was created by the recitals of finding V it undoubtedly carried with it the duty of providing a home for herself and the other children. It must be remembered that at the time the deed of 1904 was executed there was a minor son, William, under fourteen years of age and a minor daughter, Grace. It was doubtless the anxiety of the father that his minor children at least should not become homeless, and in the event, perhaps, that the stern hand of adversity should lay hold on any one of his children there still would be a shelter for even the wayward, presided over by one who had earned the right to stand in his place. No one can carefully read

the record of this case without feeling such a thought pressing upon him. It is not unlikely that such a conviction, produced from a consideration of the entire family history, developed into a concrete fact in the court's mind as firmly fixed as though witnesses had given testimony to the oral agreements found to have been made, but to which in reality no witness directly testified. But whatever may be said of the finding, it does not conflict with either II or VII in the respect that no oral promise such as is claimed and such as was necessary to create a trust was made. If from the words of said finding a trust could be evolved, it would not be the trust which plaintiffs seek here to establish. The facts found or recitals made are too vague to support any kind of a trust. But as a matter of fact the court did not intimate that a trust has been created by the acts therein related.

Ambiguity, uncertainty, and inaccuracies must be expected to occur in findings as well as in pleadings, and if by the application of the rules of construction they are cured by other findings or rendered immaterial for any reason, the court is not at liberty, for academic reasons merely, to set aside a judgment supported in other respects by the record.

Finding VII, like finding II, is specific and clear on the issue of a trust and again finds the facts to be against it. It also adheres to finding II on the issue that no valid escrow was made. The latter portion of finding V, it will be noted, uses the word "handed" instead of the word "delivery." The distincton, if any, is not important here.

We think that the court's finding against the trust is amply supported by the record. Because of the accusatory nature of the action the domestic relations of the family are laid bare. It is regrettable that the entire subject may not be dismissed with the above summary statement. It is impossible to state the facts without entering the domestic circle.

Thomas B. Sullivan was the first child and Emma Gertrude the second of the marriage of John J. and Elizabeth M. Sullivan. In 1904 Thomas was thirty-seven and Emma thirty-four years of age. Thomas received a collegiate education and later became a licensed attorney, but was then engaged as a journalist at a very remunerative salary. His

duties called him from the family domicile and he called at home every evening except on one or two evenings at the close of each week. He was married December 19, 1905. Emma was a graduate of a state normal school and had been engaged in teaching in the city schools of San Francisco for a number of years. Elizabeth F. later became a teacher. William was a youth and Grace E. a young lady of tender years. The others were as already described. John J. Sullivan, the father, was then about sixty years of age. He had been an active man in business affairs. He was evidently a man of positive and determined character and was deeply interested in the education and welfare of his children and took commendable pride in their success.

Thomas B. Sullivan, upon whose advice this action was doubtless commenced, related at great length the family history from a time prior to April, 1904, to the date of his father's death. He went minutely and with much elaboration into family discord. Only a few important features will be adverted to. It appears from his testimony that shortly after the mother's death and the action to vest title to the homestead in the father, which was met with opposition on the part of certain of the children, that the father stated to him his desire to dispose of his property at that time so "that none of his children would be in a position to rob any of the others upon his death." In so speaking he made reference to said sons. His desire was to retain possession of the property during his lifetime and to have it *distributed to all* of his children upon his death. Thomas B. Sullivan urged his father not to leave any of his property to said three sons, John, James, and Harry, as they had been wayward and that he considered them to be unworthy sons. The father remarked, according to the testimony of plaintiff Thomas B. Sullivan, that these sons would develop into decent men and he wished upon his going "to have them all receive share and share alike as his children." Just prior to this incident, however, said three sons had conspired to defeat the father's action to divest the homestead, and were then outcasts from the home and forbidden to return. The father had bitterly denounced their plot as an attempt to "put him out in the street"; "to take the roof from over his head," etc. He had expelled them from the home as being practically beyond reformation, and both Thomas

and himself had caused their arrest upon numerous occasions. From a period of several years prior to 1904 their conduct had been such as to cause the father much annoyance and trouble. One of them at least had been involved in very serious trouble. After the homestead incident none of these sons seemed to have been received at home by the father except, perhaps, James in his last illness. One never again returned.

At the meeting arranged by Thomas at A. F. St. Sure's office, the father suggested that the deed be made in Thomas' name. Thomas declined to accept it and suggested Emma as the proper person. The father rather insisted that Thomas accept it, as did also A. F. St. Sure, the attorney who prepared the instruments. The latter had never met Emma in the transactions and had no personal acquaintance with her. A. F. St. Sure, so Thomas testified, "begged me to trust myself rather than my sister." Thomas stated that Emma was a deeply religious woman; had been the "mainstay" of the household; the "woman of the family" after the mother's death, and did not, so far as he knew from her, intend to marry, and as a matter of sentiment he preferred to have the deed made in her name for the use and benefit of all of the children, etc. This arrangement, it is claimed, was agreed to between the father and Thomas at the law offices of A. F. St. Sure. Emma, it is claimed, was consulted and consented to hold it in trust for all of said children. This is positively denied by her. That she was not present is admitted. The deed, written instructions, and will were accordingly prepared and delivered to A. F. St. Sure.

Thomas' version of the execution of the will is that it was brought about by a discussion of a possible effort on the part of said three sons to disturb the disposition thus made of the property. Judge St. Sure remarked: "This [speaking of the will] will be a double security and will be for the same purpose." Judge St. Sure had no definite recollection as to why the will was made. He surmised that it was to carry the household effects. Thomas stated that the father said in the discussion touching the will he had just executed and by which he gave everything he possessed to Emma that "he would not cut them [the three sons] off from whatever he possessed because of their waywardness."

That "they were entitled to and should receive their ·share alike with the others as they would grow into good men and reform."

Thomas and Emma were friendly until October 24, 1908. Both had contributed liberally to the support and education of the younger children. At one time Thomas had given each of his sisters $1,000, which they invested to their profit. Emma, of rather delicate health, was always at home. She was the "mainstay" of the family, and had Thomas' full co-operation until a quarrel occurred which involved the entire family. On this day Thomas, as he contends, in the presence of the father and other members of the family, charged Emma with having set into action a system of "persecution" and "oppression" against all the members of the family. He claims to have protested to the father that she was insidiously poisoning his mind against the rest of his children and that she had become the bearer of false and evil tales to him against the other members of the family. This is denied by Emma, who asserts that the trouble arose over the fact that she was detained at the schoolroom until quite late one afternoon without knowledge that Thomas and his wife were to be at the father's home for dinner. Thomas became highly offended at her tardiness and claimed that it was intentional and was meant as an affront to his wife. From this event dates the development of Thomas' open hostility to his sister Emma. He did not again speak to her until she visited him six years thereafter at his office in reference to an important family matter. They were never again friendly. Thomas held several meetings with his brother William and two sisters present following October 24, 1908, none of whom had definite prior knowledge of the making of the deed of 1904, and informed them that Emma did not intend to keep a promise she had made to convey to each of them a share of said property upon their father's death. He was absolutely convinced, and so were all the others, from thence on and without any definite statement from Emma on the subject that she did not intend to comply with her promise. With this conviction in his mind he failed to mention to the father his distrust of Emma or that she had ever made a promise of any kind to be kept. None of the other children spoke to the father on this important subject.

51 Cal. App.—16

The testimony of Emma is that she had no knowledge of the execution of the deed dated June 20, 1904, until two days thereafter. She was not present when it was made. The father informed her of it when the two were together in the library. He also reminded her that she could well remember the date, as it was executed on his birthday. Being so advised by the father she consulted with Thomas about the deed at his office. No mention was made to her of a promise of any kind by either the father or Thomas or anyone else.

The father gave to Emma his reasons for giving her the property. Her health was a matter of concern to him and her Christian character deeply impressed him. The record contains evidence showing that she had been dutiful, constant, and affectionate. He had never once lost faith in her. While others had been estranged more or less from him and did not always speak with him because of some administered rebuke or disagreement, Emma was always kind and considerate. If away from home on a short vacation she corresponded with him and expressed great concern for his comfort. A number of her letters appear in the record. A deed of the family domicile cannot, under the circumstances of the family conditions, as related by Emma and her sister Grace, be said to be unreasonable or unnatural. Incidentally it may be related that on the day of the trial the mortgage debt on said property amounted to $7,190. The father unquestionably had abiding confidence in the ability and inclination of the daughter to assume the place of mother. It was the belief of the father, and also of Thomas, that Emma would remain single. Those of the family not married would, as existing conditions indicated, be most likely to marry. The *one* daughter made the sacrifice and the father gratefully referred to her many sacrifices in a conversation with Grace. The boys, ordinarily, should be able to care for themselves.

Disagreements are most likely to arise in enforcing family discipline. It is a duty, however, that must fall upon someone when the mother is removed. Here it fell upon the eldest daughter.

If it was the intention of John J. Sullivan that title in said property should become vested in all of his children upon his death his method in devising a plan is not easy

to understand.  According to Thomas B. Sullivan, the father was anxious that great care be exercised to the end that no child could be robbed by another, and yet the very thing that would have made each child secure in his or her rights was the act that was omitted.  Why a trust in parol should have been decided on, if upon the grantor's death the property described in the deed was to be immediately conveyed by the grantee named therein as a trustee, is not altogether understandable.  It was the selection of a circuitous and uncertain course as against a direct and certain course.  There was no right the trustee could have preserved; no purpose he could have served.  The sure, simple method by which fraud or imposition could have been avoided would have been to execute a deed making all the children grantees.  Such a deed, delivered as an escrow, would have met the situation perfectly.  This, however, would have permitted a sale and the breaking up of the home with two minor children to care for.  The very thing certain members of the family had attempted in the lifetime of John J. Sullivan would have been accomplished upon his death with necessities just as pressing.  If a trust, why a will?  These were some of the questions that doubtless addressed themselves to the consideration of the trial court.  The efforts made by John J. Sullivan to recover the possession of the deed from St. Sure, the will of 1912, the subsequent deed and, in short, all acts and declarations affecting the property, its management and control by John J. Sullivan and his statements, made in the presence of third persons, concerning it were pertinent to the issue of trust relations and were properly before the trial court.

Judge A. F. St. Sure, at whose office the instruments of 1904 were drawn and with whom they were deposited, was called as a witness.  A short quotation from his testimony on cross-examination will serve to illustrate the danger of relying upon memory after the passing of many years to establish a trust which must stand or fall accordingly, as meaning, shadings, and qualifications are given to words, phrases, and expressions:

"Q. It was not definitely stated what disposition he was to make?  A. Well, not that I remember—not that I remember.

"Q. At the second meeting the father came, did he? A. Yes.

"Q. Did the father suggest to you that he wanted to make a deed? A. That I don't remember.

"Q. Did you suggest to him that he should make a deed? A. I don't remember now—my recollection is I did not. I was opposed to make any such disposition of the property.

"Q. Your recollection is that you disapproved of this method of disposing of the property? A. Yes.

"Q. Do you remember what you said when you said you were opposed to this method of disposing of the property? A. No, I do not.

"Q. But you do remember that you were opposed to this method of disposing of the property? A. Yes.

"Q. Do you remember whether Tom or his father said to you that they wanted to make a deed to Emma in trust to convey to the children? A. I could not remember whether those words were used. I could not.

"Q. But you know now that in 1904 a trust to convey was void? A. If that is the law, I had nothing of that kind in my mind at that time.

"Q. You don't remember whether word 'trust' was used, do you? A. I don't.

"Q. Do you remember whether the father stated at that time that whoever was the grantee of this deed should take it upon a promise to do something with it? A. I don't.

"Q. Do you remember the word 'promise'? A. I do not.

"Q. Do you remember any more than that it was for the benefit of the whole family? A. For the benefit of all of the children, that she was the homemaker and would see that all of them got their share of it—words to that effect. That was the general thought.

"Q. That she was the homemaker? A. That she was the homemaker and they could trust her—that he could trust her; that he wanted all his children to share in this property, and if he deeded it to her that she would see that they all had their share of the property.

"Q. Do you remember that he said he could trust her to do the right thing? A. Oh, he may have said that.

"Q. Well, don't you remember he said that? A. He may have. I don't remember.''

The testimony of plaintiffs William B. Sullivan and Mrs. Elizabeth Kelly is also weakened by the same infirmities of uncertainty and indefiniteness as to what was really said in important conversations attempted by them to be reproduced. Thomas and Emma were the principal witnesses in the case. Both testified at great length. Mrs. Grace E. MacMonnies stands with Emma and corroborates her in all material respects as to the relations that existed between Emma and the father and also Emma's relations to other members of the family. James, the youngest child, and Mrs. Kelly, plaintiffs, gave testimony in support of their cause. The situation of the family, the aim and purpose of the father as far as disclosed by the evidence, his relations with other members of the family, as shown by the record evidence, and many other matters came to the attention of the trial court for its consideration. It was its duty to weigh the evidence and pass upon the credibility of the witnesses, accepting a part of the testimony of a witness and rejecting other parts as he might be convinced of their truth or falsity. After so doing he found for defendant.

[1] We have made a careful examination of the voluminous record and are fully convinced that the finding against the oral promise alleged to have been made by Emma Gertrude Sullivan to make conveyances of the property in dispute to all the children of John J. Sullivan immediately upon his death finds substantial support in the record. This determination controls the judgment and findings and all other issues become immaterial. Plaintiffs concede that the deed dated June 20, 1904, constitutes a valid escrow. If, therefore, the trust is not established it matters not to plaintiffs whether they are concluded by said deed or by the deeds dated· May 2, 1907, or by the "All Persons" action, or by either of said wills or by the deed executed and delivered May 19, 1913.

The judgment appealed from is affirmed.

Richards, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 31, 1921.

All the Justices concurred.